# EXHIBIT 2

**PROOF OF SERVICE OF SUMMONS**

F I L E D
06/03/2026
*Amy McGhee*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Kelly Frick
DV-32-2026-0000561-PI
Vannatta, Shane
7.00

ACTIVE ATTORNEYS ON THIS CASE, ATTORNEYS FOR PLAINTIFF AND PUTATIVE CLASS MEMBERS

Timothy Bechtold
BECHTOLD LAW FIRM, PLLC
P. O. box 7051
Missoula MT 59807
406-721-1435
406-830-3085 (fax)
tim@bechtoldlaw.net

Hillary P. Carls
CARLS LAW, PLLC
27 N. Church Avenue
Bozeman, MT  59715
406-577-2145
406-506-5303 (fax)
hillary@carlslaw.com

Jenna P. Lyons
LPJ LAW, P.C.
P.O. Box 16960
Missoula, MT 59808
406-541-4100
406-541-4101 (fax)
lyons@westernmontanalaw.com

PAGE 2 – DEPT 5 CAUSE NO: DV-26-561
PROOF OF SERVICE

**MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY**
200 W BROADWAY ST MISSOULA MT 59802

JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L,and ASHLEY DELANEY on behalf of C.W., a Minor Child

                                    Plaintiffs,

        Vs.

Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100

                                    Defendants

SHANE A. VANNATTA
DEPT. 5
CAUSE NO: DV – 26-561

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION.

I SERVED COPIES OF PLAINTIFF'S INITIAL DISCLOSURE OF EXPERT WITNESSES, EXHIBIT A, EXHIBIT B, AND A SERVICE LIST.

THE PARTY SERVED IS INSTAGRAM, LLC

THE ADDRESS WHERE THE PARTY WAS SERVED IS CORPORATION SERVICE COMPANY, AT 2710 GATEWAY OAKS DRIVE SUITE 150N, SACRAMENTO CA 95833.

I SERVED THE PARTY BY PERSONAL SERVICE. I PERSONALLY DELIVERED THE DOCUMENTS LISTED ABOVE TO THE PARTY OR AUTHORIZED PERSON TO RECEIVE SERVICE OF PROCESS FORE THE PARTY ON JUNE 1, 2026 AT 945am.

THE NOTICE TO THE PERSON SERVED ON THE SUMMONS WAS COMPLETED ON BEHALF OF INSTAGRAM, LLC, UNDER THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTION OTHER.

Timothy Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406.721.1435
406.830.3085 (fax)
tim@bechtoldlaw.net

Hillary P. Carls
CARLS LAW, PLLC
27 N. Church Avenue
Bozeman, MT 59715
406.577.2145
406.506.5303 (fax)
hillary@carlslaw.com

Jenna P. Lyons
LPJ LAW, P.C.
P.O. Box 16960
Missoula, MT 59808
406.541.4100
406.541.4101 (fax)
lyons@westernmontanalaw.com

*Attorneys for Plaintiff and Putative Class Members*

## MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| | |
|---|---|
| JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L., and ASHLEY DELANEY on behalf of C.W., a Minor Child,<br><br>Plaintiffs,<br><br>vs.<br><br>Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100,<br><br>Defendants. | Dept. 5<br>Shane A. Vannatta<br>Cause No: DV- 26-561<br><br><br>**SUMMONS**<br>**(INSTAGRAM, LLC)** |

///

///

Summons                                                                                      Page 1.

3

To:   Instagram, LLC.
      c/o CSC – Lawyers Incorporating Service, Registered Agent
      2710 Gateway Oaks Drive, Suite 150N
      Sacramento, CA 95800

A lawsuit has been filed against you.

Within 21 days after service of this Summons on you, you must serve on the Plaintiffs an answer to the attached Complaint or a motion under Rule 12 of the Montana Rules of Civil Procedure. Do not include the day you were served in your calculation of time. The answer or motion must be served on the Plaintiffs or Plaintiffs' attorney, if Plaintiffs are represented by an attorney, whose name and address are listed above.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint.

You must also file your answer or motion with the Court.

DATED this _15th_ day of May, 2026.



CLERK OF DISTRICT COURT

By: _____
        Deputy Clerk

Summons                                                                 Page 2.

# CERTIFICATE OF SERVICE

I, Jenna Penielle Lyons, hereby certify that I have served true and accurate copies of the foregoing Affidavit - Affidavit of Service to the following on 06-03-2026:

Timothy M. Bechtold (Attorney)
PO Box 7051
317 East Spruce Street
Missoula MT 59807
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Hillary Prugh Carls (Attorney)
Carls Law, PLLC
27 N. Church
Bozeman MT 59715
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Facebook Operations, LLC (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Instagram, LLC (Defendant)
1601 Willow Road
Menlo Road CA 94025
Service Method: First Class Mail

Meta Platforms Inc (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Electronically signed by Jessica Neville on behalf of Jenna Penielle Lyons
Dated: 06-03-2026

FILED
06/03/2026
*Amy McGhee*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Kelly Frick
DV-32-2026-0000561-PI
Vannatta, Shane
6.00

# PROOF OF SERVICE OF SUMMONS

ACTIVE ATTORNEYS ON THIS CASE, ATTORNEYS FOR PLAINTIFF AND PUTATIVE CLASS MEMBERS

Timothy Bechtold

BECHTOLD LAW FIRM, PLLC

P. O. box 7051

Missoula MT 59807

406-721-1435

406-830-3085 (fax)

tim@bechtoldlaw.net

Hillary P. Carls

CARLS LAW, PLLC

27 N. Church Avenue

Bozeman, MT  59715

406-577-2145

406-506-5303 (fax)

hillary@carlslaw.com

Jenna P. Lyons

LPJ LAW, P.C.

P.O. Box 16960

Missoula, MT 59808

406-541-4100

406-541-4101 (fax)

lyons@westernmontanalaw.com

PAGE 2 – DEPT 5 CAUSE NO: DV-26-561
PROOF OF SERVICE


**MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY**
200 W BROADWAY ST MISSOULA MT 59802


JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L,and ASHLEY DELANEY on behalf of C.W., a Minor Child


                                    Plaintiffs,


    Vs.


Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100


                                    Defendants


SHANE A. VANNATTA
DEPT. 5
CAUSE NO: DV – 26-561


AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION.


I SERVED COPIES OF PLAINTIFF'S INITIAL DISCLOSURE OF EXPERT WITNESSES, EXHIBIT A, EXHIBIT B, AND A SERVICE LIST.


THE PARTY SERVED IS FACEBOOK OPERATIONS, LLC


THE ADDRESS WHERE THE PARTY WAS SERVED IS CORPORATION SERVICE COMPANY, AT 2710 GATEWAY OAKS DRIVE SUITE 150N, SACRAMENTO CA 95833.


I SERVED THE PARTY BY PERSONAL SERVICE. I PERSONALLY DELIVERED THE DOCUMENTS LISTED ABOVE TO THE PARTY OR AUTHORIZED PERSON TO RECEIVE SERVICE OF PROCESS FORE THE PARTY ON JUNE 1, 2026 AT 945am.


THE NOTICE TO THE PERSON SERVED ON THE SUMMONS WAS COMPLETED ON BEHALF OF FACEBOOK OPERATIONS, LLC, UNDER THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTION OTHER.

PAGE 3 – DEPT 5 CAUSE NO:  DV-26-561
PROOF OF SERVICE

I, PETER GENTILE JR, 1900 DANBROOK DR, UIT 1528, SACRAMENTO CALIFORNIA, 95835, TELEPHONE NUNBER 916-955-5952, BILLED A FEE OF 95$ FOR THE SERVICE.  I AM A REGISTERED PROCESS SERVER IN THE COUNTY OF SACRAMENTO, CALIFORNIA.  I AM AN INDEPENDENT CONTRACTOR, REGISTRATION NUMBER 2012-36, REGISTERED IN SACRAMENTO COUNTY, CALIFORNIA.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

DATE  6/2/2026

PRINTED NAME  *Peter John Gentile Jr*

SIGNATURE

**PROOF OF SERVICE OF SUMMONS**

Timothy Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406.721.1435
406.830.3085 (fax)
tim@bechtoldlaw.net

Hillary P. Carls
CARLS LAW, PLLC
27 N. Church Avenue
Bozeman, MT 59715
406.577.2145
406.506.5303 (fax)
hillary@carlslaw.com

Jenna P. Lyons
LPJ LAW, P.C.
P.O. Box 16960
Missoula, MT  59808
406.541.4100
406.541.4101 (fax)
lyons@westernmontanalaw.com

*Attorneys for Plaintiff and Putative Class Members*

## MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| | |
|---|---|
| JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L., and ASHLEY DELANEY on behalf of C.W., a Minor Child,<br><br>Plaintiffs,<br><br>vs.<br><br>Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100,<br><br>Defendants. | Dept. 5<br>Shane A. Vannatta<br>**Cause No: DV-** 26-561<br><br><br>**SUMMONS**<br>**(FACEBOOK OPERATIONS, LLC)** |

///

///

Summons                                                                                                                Page 1.

4

To:    Facebook Operations, LLC
c/o CSC – Lawyers Incorporating Service, Registered Agent
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95800

A lawsuit has been filed against you.

Within 21 days after service of this Summons on you, you must serve on the Plaintiffs an answer to the attached Complaint or a motion under Rule 12 of the Montana Rules of Civil Procedure. Do not include the day you were served in your calculation of time. The answer or motion must be served on the Plaintiffs or Plaintiffs' attorney, if Plaintiffs are represented by an attorney, whose name and address are listed above.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint.

You must also file your answer or motion with the Court.

DATED this 15ᵗʰ day of May, 2026.



CLERK OF DISTRICT COURT

By: _____
Deputy Clerk

Summons

Page 2.

# CERTIFICATE OF SERVICE

I, Jenna Penielle Lyons, hereby certify that I have served true and accurate copies of the foregoing Affidavit - Affidavit of Service to the following on 06-03-2026:

Timothy M. Bechtold (Attorney)
PO Box 7051
317 East Spruce Street
Missoula MT 59807
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Hillary Prugh Carls (Attorney)
Carls Law, PLLC
27 N. Church
Bozeman MT 59715
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Facebook Operations, LLC (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Instagram, LLC (Defendant)
1601 Willow Road
Menlo Road CA 94025
Service Method: First Class Mail

Meta Platforms Inc (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Electronically signed by Jessica Neville on behalf of Jenna Penielle Lyons
Dated: 06-03-2026

**PROOF OF SERVICE OF SUMMONS**

FILED
06/03/2026
Amy McGhee
CLERK
Missoula County District Court
STATE OF MONTANA
By: Kelly Frick
DV-32-2026-0000561-PI
Vannatta, Shane
5.00

ACTIVE ATTORNEYS ON THIS CASE, ATTORNEYS FOR PLAINTIFF AND PUTATIVE CLASS MEMBERS

Timothy Bechtold

BECHTOLD LAW FIRM, PLLC

P. O. box 7051

Missoula MT 59807

406-721-1435

406-830-3085 (fax)

tim@bechtoldlaw.net


Hillary P. Carls

CARLS LAW, PLLC

27 N. Church Avenue

Bozeman, MT  59715

406-577-2145

406-506-5303 (fax)

hillary@carlslaw.com


Jenna P. Lyons

LPJ LAW, P.C.

P.O. Box 16960

Missoula, MT 59808

406-541-4100

406-541-4101 (fax)

lyons@westernmontanalaw.com

PROOF OF SERVICE

**MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY**

200 W BROADWAY ST MISSOULA MT 59802

JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L,and ASHLEY DELANEY on behalf of C.W., a Minor Child

Plaintiffs,

Vs.

Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100

Defendants

SHANE A. VANNATTA
DEPT. 5
CAUSE NO: DV – DV-32-2026-0000561-P1

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION.

I SERVED COPIES OF PLAINTIFF'S INITIAL DISCLOSURE OF EXPERT WITNESSES, EXHIBIT A, EXHIBIT B, AND A SERVICE LIST.

THE PARTY SERVED IS META PLATFORMS, INC.

THE ADDRESS WHERE THE PARTY WAS SERVED IS CORPORATION SERVICE COMPANY, AT 2710 GATEWAY OAKS DRIVE SUITE 150N, SACRAMENTO CA 95833.

I SERVED THE PARTY BY PERSONAL SERVICE. I PERSONALLY DELIVERED THE DOCUMENTS LISTED ABOVE TO THE PARTY OR AUTHORIZED PERSON TO RECEIVE SERVICE OF PROCESS FORE THE PARTY ON JUNE 1, 2026 AT 945am.

THE NOTICE TO THE PERSON SERVED ON THE SUMMONS WAS COMPLETED ON BEHALF OF META PLATFORMS, INC., UNDER THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 416.10 (CORPORATION).

PAGE 3 – DEPT 5 CAUSE NO: DV-DV-32-2026-0000561-P1

PROOF OF SERVICE

I, PETER GENTILE JR, 1900 DANBROOK DR, UIT 1528, SACRAMENTO CALIFORNIA, 95835, TELEPHONE NUNBER 916-955-5952, BILLED A FEE OF 95$ FOR THE SERVICE. I AM A REGISTERED PROCESS SERVER IN THE COUNTY OF SACRAMENTO, CALIFORNIA. I AM AN INDEPENDENT CONTRACTOR, REGISTRATION NUMBER 2012-36, REGISTERED IN SACRAMENTO COUNTY, CALIFORNIA.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

DATE 6/2/2026

PRINTED NAME *Peter John Gentile Jr*

SIGNATURE

**PROOF OF SERVICE OF SUMMONS**

Timothy Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406.721.1435
406.830.3085 (fax)
tim@bechtoldlaw.net

Hillary P. Carls
CARLS LAW, PLLC
27 N. Church Avenue
Bozeman, MT 59715
406.577.2145
406.506.5303 (fax)
hillary@carlslaw.com

Jenna P. Lyons
LPJ LAW, P.C.
P.O. Box 16960
Missoula, MT 59808
406.541.4100
406.541.4101 (fax)
lyons@westernmontanalaw.com

Attorneys for Plaintiff and Putative Class Members

## MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L., and ASHLEY DELANEY on behalf of C.W., a Minor Child,

Plaintiffs,

vs.

Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100,

Defendants.

Dept. 5
Shane A. Vannatta
Cause No: DV- 26 -561

**SUMMONS
(META PLATFORMS, INC.)**

///

///

Summons

Page 1.

2

To:     Meta Platforms, Inc.
        c/o CSC – Lawyers Incorporating Service, Registered Agent
        2710 Gateway Oaks Drive, Suite 150N
        Sacramento, CA 95800

A lawsuit has been filed against you.

Within 21 days after service of this Summons on you, you must serve on the Plaintiffs an answer to the attached Complaint or a motion under Rule 12 of the Montana Rules of Civil Procedure. Do not include the day you were served in your calculation of time. The answer or motion must be served on the Plaintiffs or Plaintiffs' attorney, if Plaintiffs are represented by an attorney, whose name and address are listed above.

If you fail to respond, judgment by default will be entered against you for the relief demanded in the Complaint.

You must also file your answer or motion with the Court.

DATED this 15th day of May, 2026.

Amy McGhee
CLERK OF DISTRICT COURT

By: _____
        Deputy Clerk

**SEAL**

Summons                                                                 Page 2.

# CERTIFICATE OF SERVICE

I, Jenna Penielle Lyons, hereby certify that I have served true and accurate copies of the foregoing Affidavit - Affidavit of Service to the following on 06-03-2026:

Timothy M. Bechtold (Attorney)
PO Box 7051
317 East Spruce Street
Missoula MT 59807
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Hillary Prugh Carls (Attorney)
Carls Law, PLLC
27 N. Church
Bozeman MT 59715
Representing: Z M L, Ashley Delaney, Jessica Vuckovich
Service Method: eService

Facebook Operations, LLC (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Instagram, LLC (Defendant)
1601 Willow Road
Menlo Road CA 94025
Service Method: First Class Mail

Meta Platforms Inc (Defendant)
1 Meta Way
Menlo Park CA 94025
Service Method: First Class Mail

Electronically signed by Jessica Neville on behalf of Jenna Penielle Lyons
Dated: 06-03-2026

FILED
05/14/2026
*Amy McGhee*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Gayle Johnston
DV-32-2026-0000561-PI
Vannatta, Shane
1.00

Timothy Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
406.721.1435
406.830.3085 (fax)
tim@bechtoldlaw.net

Hillary P. Carls
CARLS LAW, PLLC
27 N. Church Avenue
Bozeman, MT 59715
406.577.2145
406.506.5303 (fax)
hillary@carlslaw.com

Jenna P. Lyons
LPJ LAW, P.C.
P.O. Box 16960
Missoula, MT  59808
406.541.4100
406.541.4101 (fax)
lyons@westernmontanalaw.com

*Attorneys for Plaintiff and Putative Class Members*

### MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| | |
|---|---|
| JESSICA VUCKOVICH on behalf of P.P., a Minor Child, Z.M.L., and ASHLEY DELANEY on behalf of C.W., a Minor Child,<br><br>Plaintiffs,<br><br>vs.<br><br>Meta Platforms, Inc., Instagram, LLC, and Facebook Operations, LLC, and John Doe Defendants 1-100,<br><br>Defendants. | Shane A. Vannatta<br>Dept. 5<br>**Cause No: DV-** DV-32-2026-0000561-PI<br><br>**Complaint, Request for Class Certification, & Jury Trial Demand** |

///

///

1

**Introduction**

1.      American children are suffering an unprecedented mental health crisis fueled by Defendants' addictive and dangerous social media products.[1]

2.      This action seeks to hold Meta Platforms, Inc. and its subsidiaries (collectively, "Meta" or "Defendants") responsible for the injuries of, without limitation:

      a.   P.P., a 16 year old boy from Missoula, Montana, who was harmed as a direct and proximate result of Meta's defectively designed social media products, Instagram and Facebook;

      b.   C.W., a 15 year old girl from Missoula, Montana, who was harmed as a direct and proximate result of Meta's defectively designed social media products, Instagram and Facebook; and

      c.   Z.M.L., a 20 year old adult male from Missoula, Montana, who was harmed as a minor as a direct and proximate result of Meta's defectively designed social media products, Instagram and Facebook.

3.      The explosion of social media usage among America's youth is no accident. It is the result of Meta's studied efforts to induce young people—and all its users—to compulsively use its products. Borrowing heavily from the behavioral and neurobiological techniques used by slot machines and exploited by the cigarette industry, Meta deliberately embedded in its products an array of design features aimed at maximizing youth engagement to drive advertising revenue.

---

[1] Meta's actions have largely been discovered and presented in *Christina Arlington Smith, et al., v. Tiktok Inc., et al.,* Superior Court of the State of California, County of Los Angeles, Central District, Case No 22STCV21355. The Meta specific allegations herein are based on the Master Complaint (Personal Injury), Jury Trial Demanded (May 16, 2023).

Meta knew children are in a developmental stage that leaves them particularly vulnerable to the addictive effects of these features. Meta targeted them anyway, in pursuit of additional profit.

4. The defects in Meta's products exploit children and adolescents. They include, but are not limited to: an algorithmically generated, endless feed to keep users scrolling in an induced "flow state;" "intermittent variable rewards" that manipulate dopamine delivery to intensify use; metrics and graphics that exploit social comparison; appearance-altering filters that promote negative body image; incessant notifications that encourage repetitive account checking by manufacturing insecurity; inadequate, essentially illusory age verification protocols; and deficient tools for parents that create the illusion of control.

5. Meta understood the harms its products were causing. Its own internal research confirmed that Instagram is harmful to teenagers, particularly teenage girls, contributing to anxiety, depression, eating disorders, body dysmorphia, self-harm, and suicidal ideation. Meta's internal researchers found that teens reported Instagram made them feel worse about themselves, that the platform's "Explore" page elevated the risk of suicide and self-injury, and that teens who struggled with mental health told researchers the platform made those struggles worse.

6. Despite this knowledge, Meta did nothing meaningful to protect its youngest users. Instead, Meta's frequent gestures toward youth safety were, in the words of one Meta employee, "all theatre." Meta deprioritized addiction as a work area, defunded its mental health team, and actively engaged in a campaign to discredit research linking its products to youth mental health harms. Meta's reason was simple: "the growth impact was too high."

7. Plaintiffs bring claims for strict product liability (design defect and failure to warn), negligence, negligent failure to warn, negligent undertaking, fraudulent concealment and

3

misrepresentation, and violation of the Montana Consumer Protection Act, § 30-14-101, MCA, *et seq*.

**Parties**

8.      Ashlee Delaney is the mother of P.P., her minor child who is suffering and has suffered injuries as a result of his use of Meta's products. P.P. is a resident of Missoula County, Montana.

9.      Z.M.L. is an adult male, and P.P.'s older brother. He suffered injuries, including, but not limited to sexploitation as a minor, as a result of his use of Meta's products. Z.M.L. is a resident of Butte, Montana, and the events giving rise to his claims occurred in Missoula County, Montana.

10.     Jessica Vuckovich is the mother of C.W., her minor child who is suffering and has suffered injuries as a result of her use of Meta's products. C.W. is a resident of Missoula County, Montana.

11.     Plaintiffs expressly disaffirm any contract they may have made with any of the Defendants, or that Defendants may claim they made with them, before reaching the age of majority, as they lacked capacity to contract. Plaintiffs also expressly disaffirm any contract made after reaching the age of majority, because Plaintiffs' continued use of Defendants' products was compulsive and due to addiction, not an affirmation of any contract.

12.     Defendant Meta Platforms, Inc. ("Meta Platforms") is a Delaware corporation and multinational technology conglomerate with its principal place of business in Menlo Park, California. Meta Platforms owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes Instagram and Facebook.

4

13.    Defendant Instagram, LLC is a Delaware limited liability company and a wholly owned subsidiary of Meta Platforms, Inc. Its principal place of business is in Menlo Park, California.

14.    Defendant Facebook Operations, LLC is a Delaware limited liability company and a wholly owned subsidiary of Meta Platforms, Inc. Its principal place of business is in Menlo Park, California.

15.    Meta Platforms, Instagram, LLC, and Facebook Operations, LLC are referred to jointly herein as "Meta."

16.    At all times relevant hereto, each Defendant was acting by and through its employees, servants, agents, and staff, all of whom were acting within the course and scope of their employment.

17.    Plaintiff believes that the John Doe Defendants are subject to the jurisdiction of the State of Montana and this Court.  The John Doe Defendants are parties that may have been involved in the occurrence set out herein, may have been agents of, employers of, employees of franchisers or franchisees of, or contractually obligated to the named Defendants or are in privy with the named Defendants and, therefore, said John Doe Defendants may have committed one or more of the acts set out herein or may be responsible through tortuous interference, strict liability, breach of warranty, negligence, negligent misrepresentation, the law of agency, respondeat superior, franchise law or by contract for the acts of the named Defendant as set out herein. Plaintiff believes and therefore alleges that the John Doe Defendants may have committed one or more of the acts set out herein and that they would therefore be liable for the same.  Plaintiff will amend these pleadings as the case progresses to specify the various acts of the John Doe Defendants.

///

5

**Jurisdiction & Venue**

18.     This Court has jurisdiction over this action pursuant to §§ 25-2-102, 103, MCA.

19.     This Court has personal jurisdiction over Defendants because Defendants have committed tortious acts within the State of Montana, have transacted business within the State of Montana, and have caused injury within the State of Montana by acts and omissions committed both within and outside the State. Meta's products are widely available, actively marketed, and extensively used in Montana, including by minor users. Meta derives substantial revenue from advertising targeted at Montana consumers, including minor users in Montana.

20.     Venue is proper in Missoula County because the acts and omissions giving rise to this action occurred in this County and Plaintiffs reside in this County. § 25-2-118, MCA.

**Factual Allegations**

**A.  Meta's Products Are Products Subject to Montana Law.**

21.     Meta coded, engineered, manufactured, produced, assembled, and operates Facebook and Instagram, two of the world's most popular social media products, and placed the same into the stream of commerce. In 2022, two billion users worldwide were active on Instagram each month, and almost three billion were monthly active users of Facebook.

22.     The Facebook and Instagram products were made and distributed with the intent to be used or consumed by the public as part of the regular business of Meta. When installed on a consumer's device, the Meta products have a definite appearance and location, and are operated by a series of physical swipes and gestures. They are distributed and sold to the public through retail channels, including the Apple App Store and the Google Play Store.

23.     Meta has characterized Instagram and Facebook as "products" in its own internal documents, including when discussing the harms and injuries that those apps inflict on users.

6

Meta described as a "product" issue the role of Instagram's "Explore" feature in elevating the risk of suicide and self-injury in certain users.

### B. Meta Targeted Children as a Core Market.

24. Adolescents and children are central to Meta's business model. These age groups are highly connected to the Internet, more likely to have social media accounts, and more likely to devote their downtime to social media usage. Youth also influence the behavior of their parents and younger siblings.

25. Meta's own internal research emphasized the critical importance of young users. Meta recognized that "Youth and Teens are critically important to Instagram" and that "there's a new group of 13-year-olds every year and the competition over their Social Media engagement has never been more fierce." Acquiring teens was critical because they are "typically the first in a household to join" and serve as "catalysts for preteens."

26. Meta feared that losing the teen foothold would mean losing the pipeline for growth. Meta therefore designed and constantly refined its products to attract and retain young users, including conducting research on tweens (ages 10–12) to craft "product recommendations" to appeal to this age group.

27. A Software Engineer at Meta candidly admitted the company's approach: "It's not a secret that we've often resorted to aggressive tactics in the name of growth, and we've been pretty unapologetic about it."

### C. Children Are Uniquely Susceptible to Harm from Meta's Products.

28. The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

7

The prefrontal cortex, which is essential to impulse control and executive decision-making, is one of the last regions of the brain to mature, continuing to develop into young adulthood.

29.     Children (and young adults) are therefore more susceptible to addictive features in digital products and highly vulnerable to the consequent harms. Knowing this, Meta wrote code designed to manipulate dopamine release in children's developing brains and, in doing so, create compulsive use of its apps.

30.     Meta's own internal research confirmed that its products are uniquely harmful to adolescents. Meta's researchers found that teens feel addicted to Instagram, that they feel unable to stop themselves from using it, and that the tools Meta offered were not effective at limiting their time on the app.

**D.  Meta Intentionally Designed Product Features to Addict Children and Adolescents.**

31.     Meta designed Facebook and Instagram with harmful defects that users encounter at every stage of interaction with the product. These defects include, but are not limited to:

    a.      Recommendation algorithms, fueled by extensive data collection, designed to promote use in quantities and frequency harmful to adolescents;

    b.      Product features that prey upon children's desire for validation and need for social comparison, including the "Like" feature and publicly displayed engagement metrics;

    c.      Product features designed to create harmful loops of repetitive and excessive product usage, including infinite scroll, intermittent variable rewards, and auto-playing content;

    d.      Appearance-altering filters and tools that promote negative body image and appearance-based social comparison;

8

e.      Lack of effective age-verification mechanisms, despite having the ability to implement them;

f.      Inadequate parental controls and facilitation of unsupervised use of the products; and

g.      Intentionally placed obstacles to discourage cessation of use of the products.

### i.      *Intermittent Variable Rewards and Engineered Addiction*

32.     Meta programs intermittent variable rewards ("IVR") into its products. Behavioral training via intermittent rewards keeps users endlessly scrolling in search of a dopamine release, oftentimes despite their desire to put their phone down. Children, who are less likely to have adequate impulse control than adults, are more susceptible to being drawn into this engineered flow state and more likely to grow dependent on Meta's products.

33.     Facebook and Instagram utilize "Likes" to control the release of dopamine in children. As with a slot machine, users never know when a "Like" will come. Rather than delivering "Likes" in real time, Meta's products space out "Likes" and other notifications to trigger on a schedule most likely to strengthen users' addiction. This design conditions users to stay on the apps while exacerbating social comparison and feedback-seeking behaviors, creating detrimental effects on minors' mental health.

### ii.      *Infinite Scroll and Algorithmic Feed*

34.     Meta debuted infinite scrolling to ensure that users would never reach the bottom of a page and would instead keep scrolling without end or limits, leading to excessive and compulsive product use. Meta's Newsfeed algorithm was originally designed to maximize a user's time spent in one session, but Meta later changed the code to maximize as many use sessions as possible—a metric that is a strong indicator of problematic use.

35.     Despite internal researchers suggesting that Meta should "help people consolidate their use of Facebook into fewer sessions," Meta continued to focus on maximizing sessions, including for teens, even prioritizing the metric over "integrity" improvements to its products.

### iii.     The "Explore" Page and Recommendation Algorithms

36.     Instagram's "Explore" page uses algorithmic recommendations to present users with content from accounts they do not follow. Meta's own internal research identified the "Explore" feature as elevating the risk of suicide and self-injury in certain users. Despite this knowledge, Meta continued to operate the Explore feature without adequate safeguards for minor users.

37.     Meta's algorithms continuously collect data on user behavior—including what content users view, how long they view it, and what they engage with—and use this data to serve increasingly tailored content designed to maximize engagement. For adolescent users, this algorithmic personalization can create harmful feedback loops, directing vulnerable users to progressively more disturbing content related to self-harm, eating disorders, depression, and suicide.

### iv.     Appearance-Altering Filters and Social Comparison Features

38.     Instagram incorporates appearance-altering filters and tools that allow users to digitally alter their physical appearance in photos and videos. These features promote unrealistic beauty standards and drive negative appearance comparison among adolescent users, particularly girls.

39.     Meta's own internal research found that Instagram made body image issues worse for one in three teen girls. Teens who struggled with mental health reported that Instagram made their struggles worse. Despite this knowledge, Meta continued to promote and expand these features.

### v.     Notifications Designed to Manufacture Insecurity

10

40.     Meta's products employ a sophisticated system of notifications—push notifications, badges, in-app alerts, and email summaries—designed to draw users back to the platform repeatedly throughout the day. These notifications are timed and calibrated by algorithms to maximize the likelihood that a user will return to the app, creating a cycle of compulsive checking behavior. For adolescents, this constant stream of notifications disrupts sleep, impairs concentration, and generates anxiety about missing social interactions.

### vi.     Impediments to Discontinuing Use

41.     Meta's products include design features that create barriers to users who wish to stop or reduce their usage. These include features that make content and connections unavailable outside the platform, thereby creating switching costs that discourage users from leaving, as well as "FOMO"-inducing features like ephemeral content (Stories) that disappears after 24 hours, pressuring users to check in frequently or risk missing out.

### E.  Meta's Age Verification and Parental Controls Are Dangerously Defective.

42.     Children of all ages can use and become addicted to Meta's products without any effective safeguard. Meta's age verification system merely asks users to input a birthday. When a user enters a birthday indicating they are under 13, the system simply displays a message that they are not eligible. After acknowledging this message, users can immediately reattempt to create an account and input an eligible birthday. In a matter of seconds—without meaningful age verification, identity verification, or parental consent—children of all ages can create an account.

43.     Other online products employ substantially more effective and reliable age verification schemes, including connecting new users to parents' accounts, credit card verification, verification by presentation of an identification card, or linking a verified email. Meta chooses not to implement any of these systems even though they are technologically feasible and could

11

be employed at relatively low cost. Indeed, Meta itself uses an age verification technique for its Facebook Dating product that it claims can verify ages—but does not use the same technology at account startup for Facebook or Instagram.

44. Meta does not require verifiable parental consent for minors to use Facebook or Instagram. Meta's products largely lack readily available parental controls, despite their affordability and technological feasibility, hindering parents' ability to monitor and protect their children from harm.

**F. Meta Knew Its Products Were Harmful and Concealed That Knowledge.**

45. Meta had extensive internal knowledge that its products were causing serious mental health harms to young users. Internal Meta research established that:

   a. Teens feel addicted to Instagram and feel pressure to be present, feeling unable to stop themselves from using the platform;

   b. Instagram made body image issues worse for one in three teen girls;

   c. Teens who struggled with mental health reported Instagram made their struggles worse;

   d. Instagram's "Explore" page elevated the risk of suicide and self-injury;

   e. "Sex-talk" between adults and minors was 32 times more prevalent on Instagram than on Facebook;

   f. The platform's design "keeps people coming back even when it stops being good for them;" and

   g. Meta had "consistently deprioritized addiction as a work area."

46. Rather than addressing these known harms, Meta defunded its mental health team and stopped safety work. Mark Zuckerberg himself was personally warned that Meta was "not on

12

track to succeed for our core well-being topics (problematic use, bullying & harassment, connections, and SSI [suicide and self-injury])" and faced "increased regulatory risk and external criticism." Yet Meta did nothing because "the growth impact was too high."

47.     Meta actively concealed its internal findings from the public, Congress, and parents. Meta engaged in a cynical campaign to "counter-messag[e] around the addiction narrative" by discrediting existing research. Meta offered tools to parents, like "time spent" tracking, that it knew presented false data. At the same time, Meta made public statements assuring parents that its products were safe for children.

48.     Meta's safety gestures were never serious. In the words of a Meta employee, "it's all theatre."

### G. Meta Failed to Warn of Known Dangers.

49.     At no time did Meta adequately warn Plaintiffs, their parents, or the public of the addictive design of its products, the known mental health harms associated with adolescent use, or the risks that its algorithms would direct minor users to harmful content. On the contrary, Meta actively concealed these dangers and made affirmative representations that its products were safe.

50.     The addictive nature of Meta's products and the psychologically manipulative design of its algorithms are unknown to ordinary users and their parents, who do not expect that social media platforms are physically and psychologically addictive.

### H. Plaintiffs Disclaim Any Claims Based on Third-Party Publisher Liability.

51.     Plaintiffs seek to hold Meta accountable for its own acts and omissions. Plaintiffs' claims arise from Meta's status as designers and marketers of dangerously defective social media products, as well as Meta's own statements, actions, and concealment, and are not based on Meta

13

as the speaker or publisher of third-party content. Meta could fulfill its legal duty to design a reasonably safe product and furnish adequate warnings without altering, deleting, or modifying the content of a single third-party post. The harm from design features like "infinite scroll" give rise to a cause of action because such features affect how Plaintiffs interact with the platforms regardless of the nature of the third-party content viewed.

## Plaintiff-Specific Allegations

### *P.P.*

52.    P.P. was born on March 9, 2010 in Missoula, Montana. He is an avid wrestler and MMA fighter.

53.    P.P. first began using Meta at approximately age 14.

54.    Ashlee Delaney, his mother, attempted to implement parental controls and was aware that he was using the accounts.

55.    P.P. gradually became addicted to the social media platforms. He spent increasing amounts of time on the platform, often during school hours and late at night, disrupting his sleep patterns and academic performance. The use of social media has increased over time, and has diminished his ability to enjoy his life, activities, and friendships.

56.    P.P. cannot cease using social media and has trouble connecting to others and to the outside world. He has become reclusive.

57.    Social comparison for P.P. has been driven by Likes and follower counts, notifications disrupting sleep, harmful content rabbit holes created by the algorithm, and other features of the platform.

58.    P.P. suffered an intense struggle in school due to his inability to focus on schoolwork because of his constant need for social media.

14

59.     P.P. quit school.

60.     P.P.'s mother was not aware of the addictive and harmful design of Meta's products. Meta did not warn P.P. or his mother of the dangers of Instagram or Facebook use by minors. Had P.P.'s mother known of the harms, she would not have permitted P.P. to use the product and would have taken measures to reduce or eliminate use to protect her child.

61.     The harms suffered by P.P. are ongoing and they are a direct and proximate result of the defective design of Meta's products, Meta's failure to warn, and Meta's negligence. These harms were entirely preventable had Meta not prioritized profits over the health and safety of its youngest users.

### *Z.M.L.*

62.     Z.M.L. is a resident of Butte, Montana, and is an avid football player, a star track and field athlete, and attends college in Butte, Montana, where he is studying engineering.

63.     Z.M.L. first began using Meta platforms at a very young age, dating back to 2016.

64.     Ashlee Delaney, his mother, attempted to implement parental controls and was aware that he was using the accounts.

65.     Z.M.L. gradually became addicted to the social media platforms he was using and continues to use.  He spent increasing amounts of time on the platform, often during school hours and late at night, disrupting his sleep patterns and academic performance, and his relationships.

66.     The use of social media has increased over time, and has diminished his ability to enjoy his life, activities, and friendships.

67.     Z.M.L. cannot cease using social media and has trouble connecting to others and to the outside world.

15

68.     In his junior year of high school, Z.M.L. was a victim of sexploitation on Instagram. An Instagram user obtained a compromising photo of him and held the photo for ransom, forcing his mother to send them money on PayPal to prevent the release of the photo to his friend list on Instagram.

69.     The perpetrator(s) shared the photo with Z.M.L.'s friends through Instagram anyway, and Z.M.L. was humiliated, embarrassed, and utterly miserable.

70.     This incident ruined his final years of high school, had significant social ramifications for him, and resulted in permanent damage to friendships, his relationship with his girlfriend, and his self-confidence.

71.     Social comparison for Z.M.L. has been driven by Likes and follower counts, notifications disrupting sleep, harmful content rabbit holes created by the algorithm, and other features of the platform.

72.     Z.M.L. has suffered an intense struggle in his life due to his constant need for social media, even after the horrifying sexploitation incident that occurred.

73.     Z.M.L. is so addicted to these platforms that not even the sexploitation incident was enough to make him stop using it.

74.     Z.M.L's mother was not aware of the addictive and harmful design of Meta's products, nor was she aware that the parental control functions were so ineffective, particularly against individuals seeking to engage in sexploitation of minors.

75.     Meta did not warn Z.M.L. or his mother of the dangers of Instagram or Facebook use by minors.

16

76.    Had Z.M.L.'s mother known of the harms, she would not have permitted P.P. to use the product when he was a minor and would have taken greater measures to reduce or eliminate use and to protect her child.

77.    Had Z.M.L. been warned of the dangers of Instagram or Facebook use, he would not have continued to use the platforms.

78.    The harms suffered by Z.M.L. are ongoing and they are a direct and proximate result of the defective design of Meta's products, Meta's failure to warn, and Meta's negligence. These harms were entirely preventable had Meta not prioritized profits over the health and safety of its youngest users.

### C.W.

79.    C.W. is 15 years old and was born in Helena, Montana. She is an avid kayaker, freestyle skier, volleyball player, and track athlete. She has several brothers and sisters, and a loving family.

80.    C.W. first began using Instagram in middle school.

81.    Jessica Vuckovich, her mother, attempted to implement parental controls and was aware that she was using the accounts.

82.    C.W. has gradually become addicted to Instagram and Facebook. She spends increasing amounts of time on the platform, often during school hours and late at night, disrupting her sleep patterns and academic performance. She finds ways to bypass the screen time limits that Jessica has set.

83.    She uses Instagram for almost four (4) hours per day, and in the nighttime as well. Her mother attempts to limit the time C.W. uses social media, but C.W. is able to circumvent the parental controls and they are therefore ineffective.

17

84.     C.W. started skipping school, and her grades have gone from As and Bs to Cs, Ds, and failing grades. She has a significant amount of anxiety about schoolwork and her declining performance.

85.     The use of social media has increased over time, and has diminished her ability to enjoy her life, activities, athletics, outdoor recreation pursuits, family relationships, and friendships.

86.     C.W. has quit all of her athletic and outdoor activities.

87.     C.W. cannot cease using social media and has trouble connecting to others and to the outside world. She has admitted to her mother than she would not feel so anxious all the time without Meta/Instagram.

88.     She struggles with weight issues, and the platform has gradually taken away her drive to succeed in areas of creativity, gym, outdoors, athletics, and interacting with her family—all things she once loved to do.

89.     Social comparison for C.W. has been driven by Likes and follower counts, notifications disrupting sleep, harmful content rabbit holes created by the algorithm, and other features of the platform. She has suffered an increased level of anxiety and increased social anxiety as a result of comparisons made on Instagram.

90.     C.W.'s mother was not aware of the addictive and harmful design of Meta's products. Meta did not warn C.W. or her mother of the dangers of Instagram or Facebook use by minors, and in fact, concealed the nature of the harmful and addictive features.

91.     Had C.W.'s mother known of the harms and outcomes that could occur, she would not have permitted C.W. to use the product and would have gone to great measures to prevent or eliminate use and to protect her child.

92.    The harms suffered by C.W. are ongoing and they are a direct and proximate result of the defective design of Meta's products, Meta's failure to warn, and Meta's negligence. These harms were entirely preventable had Meta not prioritized profits over the health and safety of its youngest users.

**Class Allegations**

93.    Plaintiff have standing to bring this class action because they are members of the defined class, have the same interest as all class members, and have suffered the same injury as the class members.

94.    The facts stated above are common to all class members.

95.    The class description includes all individuals between 2023 and present:

    a.    Resided in Montana;

    b.    Were under the age of 18-years-old; and

    c.    Used a Meta product.

96.    To be certified, a class must comply with the four requirements of Montana Rule of Civil Procedure 23(a) and at least one of the prerequisites of Montana Rule of Civil Procedure 23(b). This class satisfies these requirements.

97.    Under Montana Rule of Civil Procedure 23(a)(1), a class may be certified if: "the class is so numerous that joinder of all members is impracticable."

98.    Meta's products are widely used in Montana.

99.    Since 2023, thousands of Montana children have used a Meta product.

100.    Given the duration of Meta's practices and large number of users, numerosity, and interests of judicial economy, joinder of all class members is impracticable in this matter.

19

101. Under Federal Rule of Civil Procedure 23(a)(2), a class may be certified if: "there are questions of law or fact common to the class."

102. The questions of law and fact are common to all members of the class.

103. Common questions of fact include:

a. Do Meta's products harm minors?

b. Did Meta know its products were harmful?

c. Did Meta defectively design its products?

d. Did Meta fail to warn Plaintiffs and class members?

e. Did Meta harm the Plaintiffs and class members?

f. Did Meta conceal and misrepresent the dangers of its products?

g. Did Meta act with reckless indifference to a high probability of injury to the Plaintiffs?

h. Was Meta's conduct intentional, willful, wanton, reckless, malicious, and/or oppressive?

104. Common questions of law include:

a. Did Meta's actions violate Montana law?

105. The questions of law and fact are common to the class.

106. Under Montana Rule of Civil Procedure 23(a)(3), a class may be certified if: "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

107. Plaintiff' claims are typical of the claims of all class members in that their claims arise from the same course of conduct giving rise to the claims of other class members.

108. The factual and legal theories that form the basis of the claims brought by Plaintiff are identical to the legal theories that form the basis of the claims of all class members.

20

109. Plaintiff' claims are typical of the claims of the class.

110. Under Montana Rule of Civil Procedure 23(a)(4), a class may be certified if: "the representative parties will fairly and adequately protect the interests of the class."

111. Plaintiffs are members of the class. Plaintiff and all class members have suffered losses and have been damaged as a result of Meta's actions and inaction.

112. Plaintiffs' interests are identical to, and not antagonistic towards, those of other class members.

113. Plaintiffs have a personal financial stake in the outcome of this lawsuit, and are dedicated to ensuring that Meta's conduct ends and does not continue in the future.

114. Plaintiffs are committed to conscientiously representing the class.

115. Plaintiffs have retained qualified, experienced counsel who are able to conduct this litigation. They are licensed to practice law and are attorneys in good standing. The undersigned attorneys hereby certify that they will fairly and adequately protect the interests of the class.

116. Plaintiffs and the undersigned counsel will fairly and adequately protect the interests of the class.

117. Under Montana Rule of Civil Procedure 23(b)(2), a class may be certified if Meta has: "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole…."

118. Plaintiffs and the putative class seek injunctive and declaratory relief to end Meta's actions, which would affect the rights and interests of all class members.

119. Meta has acted in a manner applicable to the class as a whole.

120. Therefore, Plaintiffs and class members seek to have the injunctive and declaratory relief applied to the class as a whole.

121.   Plaintiffs and class members seek to end Meta's conduct and ensure that it does not continue in the future.

122.   The injunctive and declaratory relief sought are important remedies and should benefit the entire class population.

123.   Under Montana Rule of Civil Procedure 23(b)(3), a class may be certified if: "the questions of law and fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

124.   Class members have little interest in individually seeking or controlling this litigation because of the complexities of this litigation against Meta, a large, corporate defendant.

125.   There is no other known litigation involving these issues and the class members.

126.   There are no known difficulties of managing this class action.

127.   Given the potential for some class members to have relatively low monetary value damages, the economic realities direct that this matter should proceed as a class action or not at all.

128.   The legal and factual issues of the class members predominate those affecting individual members, and this class action is the superior method to litigate this matter fairly and efficiently.

129.   Each legal and factual allegation herein applies to Plaintiffs and class members.

<u>**Count 1 – Strict Liability – Design Defect**</u>

130.   Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

131.   Montana recognizes strict product liability for defective products. § 27-1-719, MCA. A product is defective in design when the foreseeable risks of harm posed by the product could

22

have been reduced or avoided by the adoption of a reasonable alternative design, and the omission of the alternative design renders the product not reasonably safe.

132. Meta designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Meta actively marketed, and because the foreseeable use of Meta's products causes mental and physical harm to minor users.

133. Meta's products contain numerous defective design characteristics including, but not limited to: recommendation algorithms designed to promote harmful and compulsive usage; intermittent variable rewards that exploit dopamine responses; infinite scroll features; appearance-altering filters that promote negative body image; the "Like" feature and publicly displayed engagement metrics that exploit social comparison; inadequate age verification; and inadequate parental controls.

134. These defective design features are not necessary for the utility provided to the user but are implemented by Meta solely to increase profits derived from each additional user and the length of time Meta can keep each user dependent on its product.

135. It is feasible to design alternative social media products that do not incorporate these harmful features, or that incorporate meaningful safeguards against their harmful effects on minor users, at negligible cost.

136. The defects in Meta's products existed prior to their release to Plaintiffs and the public. There was no substantial change to the products between the time of their upload to retail channels and the time of their distribution to Plaintiffs.

137. As a proximate result of these defective designs, Plaintiffs have suffered injuries and damages in an amount to be determined by a jury.

## Count 2 – Strict Liability – Failure to Warn

138.    Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

139.    Meta sold and distributed its products in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm associated with use of the products by minor users, including the risk of addiction, compulsive use, anxiety, depression, eating disorders, body dysmorphia, self-harm, suicidal ideation, and death.

140.    Meta knew, based on its extensive internal research, that its products posed serious health risks to minor users. Despite this knowledge, Meta failed to provide any adequate warnings to users, parents, or the public. Instead, Meta actively concealed these dangers and made affirmative misrepresentations that its products were safe.

141.    Had Meta provided adequate and prominent warnings regarding the addictive nature and mental health risks of its products, Plaintiffs' parents would not have permitted them to use the product, and Plaintiffs' injuries would have been avoided.

142.    As a proximate result of Meta's failure to warn, Plaintiffs have suffered significant injuries and damages in an amount to be determined by a jury.

## Count 3 – Negligence – Design

143.    Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

144.    Meta owed Plaintiffs a duty to exercise reasonable care in the development, design, management, maintenance, operation, marketing, advertising, promotion, and control of its

24

products not to create an unreasonable risk of harm. These duties govern Meta's own specific actions based on direct actions Meta took in developing its products and features.

145.    Meta owed a heightened duty of care to minor users of its products because children's brains are not fully developed, resulting in diminished capacity for impulse control, risk evaluation, and psychological resiliency.

146.    Meta also owed a special relationship duty to Plaintiffs to protect them against harm. As a business, Meta owes a duty to protect customers against reasonably foreseeable dangers on its platforms. Plaintiffs are comparatively vulnerable and dependent on Meta for a safe environment, and Meta has a superior ability and control to provide that safety.

147.    Meta breached its duties by, among other things: designing its products with addictive features known to harm minors; failing to implement adequate age verification; failing to provide adequate parental controls; failing to take remedial action despite knowledge of harm; actively concealing the dangers of its products; and prioritizing growth and profits over user safety.

148.    As a proximate result of Meta's negligence, Plaintiffs suffered injuries and damages in an amount to be determined by a jury.

<strong><u>Count 4 – Negligence – Failure to Warn</u></strong>

149.    Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

150.    Meta knew, or by the exercise of reasonable care should have known, that use of its products was dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. Meta knew that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of its products, including the risk of addiction, compulsive use, sleep deprivation, anxiety, depression, eating disorders, self-harm, suicidal ideation, and other injuries.

25

151.     Meta had a duty to warn users, parents, and the public of these known dangers. Meta breached this duty by failing to provide any adequate warning and by actively concealing the dangers from users, parents, and the public.

152.     As a proximate result of Meta's negligence, Plaintiffs suffered injuries and damages in an amount to be determined by a jury.

<b><u>Count 5 – Negligent Undertaking</u></b>

153.     Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

154.     Meta rendered age verification services to Plaintiffs. Meta should have recognized that effective age verification services were needed for the protection of minor users under applicable federal and state laws.

155.     Meta owed a heightened duty of care to minor users and their parents to implement age verification services that were effective and would prevent access by underage users. Plaintiffs relied on Meta exercising reasonable care in undertaking to render age verification services.

156.     Meta breached its duty by failing to use reasonable care in rendering its age verification services, allowing children of all ages to access and become addicted to its products without any effective safeguard.

157.     As a proximate result of Meta's negligence, Plaintiffs suffered injuries and damages in an amount to be determined by a jury.

<b><u>Count 6 - Fraudulent Concealment & Misrepresentation</u></b>

158.     Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

26

159.    Meta knew about the defective condition of Instagram and Facebook and that its products posed serious health risks to users, particularly youth. Meta was under a duty to tell the public the truth and to disclose the defective condition of its products.

160.    Meta breached its duty by concealing, failing to disclose, and making misstatements about the serious safety risks presented by Instagram and Facebook. Even though Meta knew of those risks based on internal studies, external studies known to Meta, and information conveyed by scientific experts directly to Meta executives, Meta intentionally concealed those findings in order not to lose users and advertising revenue, and to induce youth, including Plaintiffs, to continue using its products.

161.    Meta:

a.    Concealed, suppressed, or omitted to disclose that its products were designed and intended to addict users, including minor users;

b.    Concealed, suppressed, or omitted to disclose that its products carried a risk of addiction, compulsive use, anxiety, depression, eating disorders, self-harm, and suicidal ideation;

c.    Concealed, suppressed, or omitted to disclose that its products directed minor users to harmful content via algorithmic recommendation;

d.    Concealed, suppressed, or omitted to disclose that its products were not safe or suitable for use by children;

e.    Represented that its products were safe and appropriate for family use when Defendants knew this to be false;

f.    Concealed, suppressed, or omitted to disclose that its corporate profits depended on user addiction and maximizing time spent on its products; and

27

g.      Actively discredited external research linking its products to youth mental health harms while suppressing its own internal research confirming those same harms.

162.    Meta made numerous partial material representations downplaying any potential harm and reassuring the public, Congress, and parents that its products were safe, including public statements regarding youth safety features, product development announcements, and Congressional testimony.

163.    Meta's concealment and misrepresentations were material. Had the true facts been known, Plaintiffs and their parents would not have used or permitted the use of Meta's products.

164.    As a direct and proximate result of Meta's fraudulent concealment and misrepresentation, Plaintiffs suffered injuries and damages in an amount to be determined by a jury.

## Count 6 – Declaratory Judgment

165.    Plaintiffs reallege and incorporate by reference each preceding allegation as if fully stated herein.

166.    A dispute exists between Plaintiffs and class members and Meta concerning their respective rights and obligations Meta's products.

167.    A justiciable controversy exists as contemplated by § 27-8-101, MCA, *et seq*.

168.    Plaintiff and class members seek declaratory relief and ask this Court to enter judgment determining and enforcing their rights including but not limited to declarations that:

a.      Prohibit Meta from continuing to engage in the unlawful acts described herein.

b.      Order Meta to implement effective age verification, adequate parental controls, prominent warnings regarding the addictive and harmful nature of its products, and redesign of the defective features identified herein.

28

c.    Order Meta to notify all class members of this case, Meta's violations of Montana law, and class member's right to damages.

**Demand for Jury Trial**

Plaintiffs hereby demand trial by jury as to all issues so triable.

**Prayer for Relief**

Plaintiffs pray for judgment as follows:

1.    Certification of the class action;

2.    Judgment in favor of Plaintiffs and class members and against Meta on all Counts;

3.    An incentive award for the named Plaintiffs and class representatives;

4.    Compensatory damages, jointly and severally;

5.    For declaratory and injunctive relief;

6.    Treble damages;

7.    Costs and disbursements incurred;

8.    Interest;

9.    Attorney fees; and

10.    For such other and further relief as the Court may deem just and proper.

Dated this 13th day of May, 2026.

Timothy Bechtold
Hillary P. Carls
Jenna P. Lyons
*Attorneys for Plaintiffs and Class Members*

29